IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DAVID CHRISTOPHER LEE WALTON,

          Plaintiff,

    v.

LIEUTENANT STAN HENDRICKSON,
SERGEANT RYAN HALLMAN and
SERGEANT PATRICA FISH,

          Defendants.

OPINION AND ORDER

17-cv-956-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Pro se plaintiff David Walton, who is incarcerated at the Waupun Correctional Institution, is proceeding on Fourteenth Amendment claims that defendants Ryan Hallman and Patrica Fish denied him access to adequate medical treatment and that defendants Stan Hendrickson, Hallman and Fish subjected him to unconstitutional conditions of confinement while he was incarcerated on a probation hold in the Monroe County jail. Before the court is defendants' motion for summary judgment. Dkt. #61. For the reasons explained below, I am granting defendants' motion for summary judgment and closing this case.

From defendants' proposed findings of fact, I find the following facts to be undisputed unless otherwise noted. (Plaintiff did not file any proposed findings of fact of his own.)

## UNDISPUTED FACTS

### A. The Parties

Plaintiff David Walton is incarcerated at the Waupun Correctional Institution, but all of the events relevant to his claims occurred while he was incarcerated for a probation violation at the Monroe County jail in Sparta, Wisconsin in June 2015. Defendants all worked at the jail when plaintiff was incarcerated there: Stan Hendrickson was the administrator and Ryan Hallman and Patrica Fish were sergeants.

### B. Plaintiff's Booking, Jail Transfer and Suicide Attempt

After plaintiff was booked into the jail on June 12, 2015, he received a copy of Inmate Handbook #55, which states that "[i]f an inmate has a medical or mental health problem, they should fill out a medical request form. For medical emergencies notify the jail staff as soon as possible." Dkt. #64-2 at 12. Defendants never denied plaintiff a complaint form.

The "intake medical screening report" completed by jail staff and signed by plaintiff on June 12, 2015 states that at the time of booking, plaintiff denied being sick, taking any prescription medication or having past psychiatric treatment. Plaintiff stated that he had made a suicide attempt in 2012. The "health transfer summary" completed by jail staff on the same day listed "suicide attempts/threats," "unusual/bizarre behavior" and "hyper/anxious" as precautions but did not identify any current medical conditions or medications. Dkt. #64-3 at 2. (Plaintiff says that he was "showing signs of mental health" prior to booking and "disclosed his nerve pain to staff" at the time of booking and to

defendant Hallman at a later time but does not state specifically what he told to Hallman or other jail staff. Dkt. #71 at ¶¶ 22 and 29.)

On June 15, plaintiff was transferred to the Vernon County jail. The health transfer summary form completed on that day did not identify any precautions, medical conditions or medications for plaintiff. At the Vernon County jail, the booking officer screened plaintiff for medical and mental health problems, including the risk of suicidal behavior. The form states that plaintiff admitted having made multiple suicide attempts in the past but denied feeling suicidal on June 15 and denied taking any medication for mental health problems. Plaintiff signed the screening forms. (Although plaintiff contends that these screenings never happened, he has not supported his contention with an affidavit or any other admissible evidence and has not explained why he signed the forms.)

On June 17, 2015, plaintiff attempted suicide and threatened to do so again if he was not returned to the Monroe County jail. He was transferred back to the Monroe County jail and placed on a suicide watch for the remainder of June 17 and on June 18, 2015. (Although defendants say that the duration of the suicide watch was 24 hours, plaintiff says that it was only 18 hours.) The suicide watch ended on June 18, 2015, after plaintiff spoke with Dr. Butler, who determined that plaintiff was no longer at risk. (The parties dispute whether plaintiff saw mental health clinician Kay Lisick on June 22, 2015. Defendants have presented clinical records in which Lisick notes that she saw plaintiff on that day; that plaintiff reported having diagnoses of schizophrenia, bipolar disorder and depression that required medication; and that she referred plaintiff to Dr. Butler for possible psychotropic

3

medication. Plaintiff avers that this visit did not occur, but in his earlier deposition testimony, he admitted that it was possible he saw Lisick on this day but does not remember it.)

### C. Disciplinary Confinement

On June 24, 2015, plaintiff was disciplined for a major violation for his July 17th threat that he would commit suicide if he was not returned to the Monroe County jail. He waived his right to a hearing on the matter and did not appeal the disciplinary determination that followed. Defendants Fish and Hallman imposed an eight-day discipline on plaintiff, which included confinement in a holding cell from June 24 to 27, 2015 and confinement in a general population block cell from June 28 to July 1, 2015. During the disciplinary confinement, plaintiff was allowed out of his cell for one hour each day and his personal belongings and mattress were removed from his cell for several hours each day. (Defendants say that the items were removed for 12 hours a day, which they say complies with Wis. Admin. Code § DOC 350. Plaintiff says that the items were removed for 15 hours a day.) However, plaintiff had a mattress to sleep on every night, was provided with hygiene products and was allowed to shower. He was provided clean clothing and bedding on June 20, 2015.

Plaintiff testified at his deposition that his initial holding cell was extremely uncomfortable, with a probable temperature in the mid to high 80s during the day but cooler

at night. Dkt. #60 at 25-28. He described the cell as being "a little sticky" and "muggy" at night. Id. at 27.

On June 29, 2015, plaintiff filed a grievance in which he complained about having to stay in "dirty living quarters," remain in a dirty uniform, sleep on dirty sheets and sit and sleep on the floor for 15 hours a day while he was in "lockdown" for four days. Dkt. #71-2. He also stated in the grievance form that he was refused cleaning supplies and clean clothing and bedding when he asked for them, but that after four days, he spoke with Fish, who provided him clean uniforms. Id. In the grievance form, plaintiff did not explain what he meant by the holding cell being dirty and did not discuss its temperature or plumbing.

The Monroe County Sheriff's Office maintains records of maintenance requests and logs for all maintenance work performed on the cells at the jail. There are no logs or maintenance requests with respect to plumbing or water pressure for the holding cell in which plaintiff was housed in June 2015. (The parties dispute whether plaintiff told Hallman about the plumbing issues in his holding cell between June 24 and 27, 2015. Hallman says that he was not aware of any plumbing or water pressure problems. Plaintiff avers that he told Hallman "about the plumbing issues" in his holding cell on June 24, 2015, and that he had to remain in the cell "without the plumbing working" for several days. Dkt. #71 at ¶¶ 27-28. Plaintiff clarified in his deposition testimony that the water pressure in his holding cell was so low that water barely ran out of the sink and the toilet would not flush. Dkt. #60 at 31. He further testified that Hallman said he "would look into it" and then someone checked the plumbing and cut off the water entirely for a little more than two

5

days.  Id. at 32.  Plaintiff brought the issue up again with another guard but was moved to the other cell block around this time.  Id.)

Fish responded to plaintiff's grievance about the cleanliness of his cell in a letter dated July 1, 2015, telling plaintiff that he could request a cleaning cart that would be provided as time permitted.  She also agreed to raise the cleaning issue with jail staff.  Plaintiff was not "totally disappointed in [Sergeant Fish's] response" to his complaints and thinks her response "was fair" but "believe[s] that she could have just did a little bit more personally." Dkt. #60 at 59.

### D. Medical Treatment

Before the jail doctor to prescribe any medication, plaintiff had to sign a medical release form so that the jail could obtain his medical records. On June 23, 2015, plaintiff submitted a sick call request and signed a release form for his medical records.  Jail staff obtained plaintiff's medical records on June 29, 2015.

On June 24, July 9 and July 13, 2015, plaintiff signed forms refusing to see a nurse for sick call, acknowledging that doing so could cause "[p]ossible delay in medical treatment; diagnosis; needed change in medical treatment or medication; and possible death" and "[p]ossible delay in needed assessment and treatment of a medical problem; may increase life threatening complications; [p]ossible death."  Dkt. #61-7 at 10-13.

Plaintiff testified at his deposition that during his holding cell confinement from June 24 to 27, 2015, his legs were "in a little bit of pain" after having to sit on a concrete slab and

6

stand on his feet. Dkt. #60 at 51. He also testified that while he was on holding cell discipline, he suffered "a couple of anxiety attacks" that were "kind of overlooked." Id. at 50. Plaintiff testified that he told Fish and other officers during this period that he wanted to see a mental health practitioner for medication but he "was denied access" to mental health services. Id. at 52.

In the grievance form plaintiff filed on June 29, 2015, he noted that his mental health problems, for which he did not have his medication, had led to his disciplinary confinement. In her July 1, 2015 response, Fish noted that plaintiff had seen Lisick on June 22, 2015 and stated that she would place plaintiff back on the list to see Lisick.

On July 1, 2015 (the last day of plaintiff's disciplinary confinement), Dr. Butler prescribed a medication for plaintiff's bipolar disorder, but plaintiff refused to take the medication on July 2. Lisick saw plaintiff for a "follow up" on July 2 and 15, 2015 and referred him to Dr. Butler for possible medication changes.

OPINION

A. Legal Standard

Because plaintiff was on a probation hold at the time the alleged events occurred, his claims that defendants refused him access to medical care and placed him in inhumane conditions of confinement are governed by the Fourteenth Amendment. Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015); Miranda v. County of Lake, 900 F.3d 335, 350-53 (7th Cir. 2018). As defendants point out, I stated in my order screening plaintiff's

7

complaint that the Court of Appeals for the Seventh Circuit applies the same deliberate indifference standard to these claims under both the Eighth Amendment and Fourteenth Amendment. Smith v. Dart, 803 F.3d 304, 310 (7th Cir. 2015). However after the entry of that order, the court of appeals clarified that a Fourteenth Amendment due process challenge to a prison official's response to a pretrial detainee's serious medical need or substantial risk of serious harm is subject to an objective reasonableness standard. Miranda, 900 F.3d at 353. Although the court of appeals did not address other types of conditions of confinement claims, it did recognize that medical care is a condition of confinement and that the Supreme Court has "disapproved of the uncritical extension of Eighth Amendment jurisprudence to the pretrial setting." Id. at 350-51 ("Pretrial detainees stand in a different position [from convicted prisoners]: they have not been convicted of anything, and they are still entitled to the constitutional presumption of innocence. Thus, the punishment model is inappropriate for them.").

The objective reasonableness analysis proceeds in two steps. McCann v. Ogle County, 909 F.3d 881, 886 (7th Cir. 2018); Miranda, 900 F.3d at 352-53. First, the court focuses on the intentionality of defendants' conduct and "asks whether the . . . defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's] case." Id. A showing of negligence or even gross negligence will not suffice. Id. At the second step, the court considers "the totality of facts and circumstances" faced by defendants and "gauge[s] objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." Id.

Although defendants have argued that both of plaintiff's conditions of confinement claims fail under the more stringent Eighth Amendment deliberate indifference standard, their arguments apply with equal force to the Fourteenth Amendment objective reasonableness standard under the facts in this case. I conclude that, for the reasons explained below, plaintiff has failed to submit evidence sufficient to withstand summary judgment on either of his claims. He relies solely on the allegations in his complaint and general statements in his affidavit, but, as the party with the burden of proof, he cannot simply rest on the allegations in his complaint, Sparing v. Village of Olympia Fields, 266 F.3d 684, 692 (7th Cir. 2001), or on his subjective beliefs, Fane v. Locke Reynolds, LLP, 480 F.3d 534, 539 (7th Cir. 2007). He must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). See also Knight v. Wiseman, 590 F.3d 458, 463-64 (7th Cir. 2009) ("[T]he evidence submitted in support of the nonmovant's position must be sufficiently strong that a jury could reasonably find for the nonmovant.").

## B. Denial of Medical Care

Plaintiff contends that he was denied medical and mental health care while in holding cell confinement between June 24 and 27, 2015, but he has not presented any evidence showing that defendants Hallman or Fish knew he needed help during this period, that they purposefully, knowingly or recklessly denied him access to medical or mental health care or that they otherwise acted in an unreasonable manner with respect to his health. Swisher v.

Porter County. Sheriff's Department, 2019 WL 1034368, at *3 (7th Cir. Mar. 5, 2019) (medical care not objectively unreasonable where treatment administered was not purposefully, knowingly or recklessly inadequate and did not result in undue consequences to plaintiff's health); McCann, 909 F.3d at 887 ("Viewed objectively, [defendant's] care for McCann was diligent and attentive—falling well short of violating McCann's due process rights.").

Plaintiff does not specify when he informed Hallman of his "nerve conditions" or what, if anything, he told Hallman about those conditions. He avers in his affidavit nothing more than "at one point," Hallman told him that it would be a waste of time to put in a medical request slip because the doctor would not give out pain medication. Dkt. #71 at ¶ 30. Plaintiff provided more detail in his deposition testimony, stating that sitting and standing on the concrete slab in his holding cell caused him to have "a little bit of pain" in his legs because of his nerve problems and that Hallman told him to "put in a slip" because it was not an emergency. Dkt. #60 at 51. However, a reasonable jury would not conclude from this testimony that plaintiff had an urgent health care need related to his nerve pain that required immediate treatment from a health care provider. By plaintiff's own admission, Hallman told him to submit a written request for medical care, which is not an unreasonable response to plaintiff's reports of "a little bit of pain" in his legs. Further, the undisputed facts also show that plaintiff was offered visits with a nurse on June 24, July 9 and July 13, 2015, but refused care on those dates.

10

Plaintiff provides even less information about his interaction with defendant Fish, stating only that she denied his requests for mental health treatment while he was on holding cell confinement. Although he says that he had three anxiety attacks that were "overlooked" during this time period, he has not presented any evidence that Fish knew about these attacks or had any opportunity to respond to them. In any event, the undisputed facts show that Fish promptly reviewed plaintiff's June 29, 2015 grievance form, in which plaintiff mentioned his mental health concerns and scheduled plaintiff for a follow-up visit with Lisick the next day. In addition, on July 1, 2015—the same day that Fish responded to plaintiff's grievance—Dr. Butler prescribed medication for plaintiff's bipolar disorder, which plaintiff refused to take. After Lisick saw plaintiff on July 2 and 15, 2015, she referred him to Dr. Butler for possible medication changes.

Without more, a reasonable jury would not conclude that defendants Hallman or Fish acted unreasonably under the circumstances. Therefore, Hallman and Fish are entitled to summary judgment on plaintiff's Fourteenth Amendment claims that they denied him access to medical care.

### C. Conditions of Holding Cell

Plaintiff's second conditions of confinement claim also fails for lack of any evidence to support it. He contends that the holding cell in which defendants Hendrickson, Hallman and Fish placed him from June 24 to 27, 2015, was extremely hot (approaching the mid to high 80s during the day), did not have working plumbing and contained dirt, dust, hair,

urine and what appeared to be feces on the wall and floor by the toilet. He further contends that defendants denied him a mattress for 15 hours a day, as well as cleaning supplies, clean clothes and clean bedding during the same time period. However, plaintiff has failed to present any evidence that he notified Hendrickson or Fish about any of these conditions until he filed a grievance form in which he complained about "dirty" living quarters, uniform and sheets and not having a mattress for 15 hours a day. He did not discuss the holding cell temperature or plumbing in his grievance form.

To be liable under § 1983, defendants must have been "personally responsible" for the constitutional deprivation, which means that they "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." Matthews v. City of East St. Louis, 675 F.3d 703, 708 (7th Cir. 2012) (citations and quotation marks omitted). By the time plaintiff filed his grievance on June 29, 2015, he had been removed from the holding cell and placed in a cell in the general population. Further, plaintiff admits that Fish provided him clean clothing at some point before he filed his grievance and that she responded to the grievance by explaining how he could request a cleaning cart in the future.

The parties dispute whether plaintiff told Hallman about "plumbing issues" on June 24, 2015. Under plaintiff's version of the events, the water pressure in the holding cell was so low that water barely ran out of the sink and the toilet would not flush. However, plaintiff admits that Hallman said he "would look into it" and that another person checked the plumbing. Although plaintiff complains that the water was cut off entirely for a little more than two days, he fails to present any evidence that Hallman knew about the alleged

water cut off or was responsible for plumbing in the holding cell area. In fact, plaintiff testified that he told a different guard about the lack of water. Prison officials "cannot be thought to be reckless if the remedial step was not within their power." Miller v. Harbaugh, 698 F.3d 956, 962 (7th Cir. 2012). Further, plaintiff has submitted no evidence to contradict the lack of logs or maintenance requests with respect to plumbing or water pressure for the holding cell in which plaintiff was housed in June 2015.

Defendants admit that they removed plaintiff's mattress and personal items several hours a day while he was on holding cell confinement and that plaintiff may not have had the opportunity to exchange his clothing or bedding between June 20 and 27, 2015. However, apart from stating that sitting and standing on the floor during the day was uncomfortable and hurt his legs a "little bit," plaintiff has not explained how the lack of these items harmed him or rose to the level of a constitutional deprivation. It is undisputed that plaintiff had a mattress to sleep on every night and was allowed personal hygiene products and a shower every day. Without more, a reasonable jury would not conclude that plaintiff's limited access to a mattress or a change of clothing and bedding for a period of a few days rises to the level of objective unreasonableness. The United States Supreme Court has made it clear that "the Constitution . . . does not mandate comfortable prisons." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citing Rhodes v. Chapman, 452 U.S. 337, 349 (1981)). See also Burton v. Downey, 805 F.3d 776, 786 (7th Cir. 2015) (unconstitutional conditions of confinement involve "deprivations of essential food, medical care, or sanitation" and plaintiff presented no evidence to support allegation that sleeping on single

mattress amounted to deprivation of this magnitude); Putney v. Likin, 656 Fed. App'x 642 (4th Cir. 2016) ("In this case, [the inmate] has so far failed to explain how the denial of a mattress was anything more than a discomfort."); Alfred v. Bryant, 378 Fed. App'x 977, 980 (11th Cir. 2010) ("Objectively speaking, sleeping on a steel bed without a mattress for eighteen days, though uncomfortable, is not so extreme as to violate contemporary standards of decency."); Perkins v. Sheahan, 2005 WL 1564976, at *3 (N.D. Ill. May 10, 2005) ("Being denied clean clothes and bedding for thirty days, though unpleasant, is not a deprivation serious enough to support an Eighth Amendment claim."); Moss v. DeTella, 1997 WL 24745, at *2 (N.D. Ill. Jan.16, 1997) (holding that lack of clean clothes and bedding for 111 days did "not rise to the level of a constitutional violation").

Accordingly, defendants Hendrickson, Fish and Hallman are entitled to summary judgment on plaintiff's claim related to the conditions of his holding cell confinement.

ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Stan Hendrickson, Ryan Hallman and Patrica Fish, dkt. #61, is GRANTED. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 30th day of April, 2019.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge